**BRIAN J. FOLEY, Attorney at Law**
BY: **BRIAN J. FOLEY, ESQ.** (PA ID No. 68806)
6701 Germantown Avenue, Suite 200
Philadelphia, PA 19119
(267) 930-4425
*Attorney for Plaintiff Joseph A. Diorio, Jr.*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **JOSEPH A. DIORIO, JR.,** | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. 26-8347 |
| v. | : | |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| c/o Law Department | : | |
| 1515 Arch Street | : | |
| Philadelphia, PA 19102 | : | |
| | : | |
| and | : | |
| | : | |
| **ADAM K. THIEL** | : | |
| in his individual capacity | : | |
| | : | |
| and | : | |
| | : | |
| **NICOLE MORRIS** | : | |
| in her individual capacity | : | |
| | : | |
| and | : | |
| | : | |
| **KIRK McCLARREN** | : | |
| in his individual capacity | : | |
| | : | |
| and | : | |
| | : | |

| | | |
|---|---|---|
| **CANDI BLOSSOM JONES** | : | |
| in her individual capacity | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Joseph A. Diorio, Jr. ("Mr. Diorio"), through his undersigned counsel, brings this Complaint against Defendants City of Philadelphia, Adam K. Thiel, Nicole Morris, Kirk McClarren, and Candi Blossom Jones, and avers as follows:

### Nature of the action

1. After more than 33 years of service to the City of Philadelphia, Mr. Diorio, the First Deputy Commissioner of the City's Department of Licenses and Inspections, was summoned by email on the morning of June 18, 2026 to a meeting that afternoon, handed a termination letter signed by an official he had never met, and told that he was fired not only from his exempt position but also from the permanent civil-service position from which he was on leave.

2. The City gave Mr. Diorio no notice of any specific charge, no explanation of its evidence, and no opportunity to respond. Instead, the City labeled the removal "disciplinary" and invoked Philadelphia Civil Service Regulation 15.044.2 to declare that Mr. Diorio thereby forfeited both restoration to his civil-service title and any right to appeal to the Civil Service Commission. More than four months later, the Commission has not decided whether it will hear Mr. Diorio's appeal at all.

3. The termination came thirteen days after Mr. Diorio's FMLA authorization expired while the City sat on his request for renewal paperwork, less than two hours after he renewed that request in writing, and was carried out by two officials tied to his two earlier lawsuits against the City: a City employee he had personally sued and the City attorney who had overseen the City's defense.

4. Mr. Diorio brings claims under 42 U.S.C. § 1983 for violation of the Due Process Clause of the Fourteenth Amendment; under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), for interference and retaliation; and under the Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et seq.*, for retaliation against his good-faith reports of wrongdoing.

**Jurisdiction and venue**

5. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) and 29 U.S.C. § 2617(a)(2). The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

6. This Court has supplemental jurisdiction over Mr. Diorio's state-law claim under 28 U.S.C. § 1367(a) because that claim forms part of the same case or controversy as his federal claims.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this District and all of the events giving rise to Mr. Diorio's claims occurred here.

**Parties**

8. Plaintiff Joseph A. Diorio, Jr. is an adult individual residing in Philadelphia, Pennsylvania.

9. Defendant City of Philadelphia (the "City") is a city of the first class and a political subdivision of the Commonwealth of Pennsylvania. At all relevant times, the City was Mr. Diorio's employer, and its officials acted under color of state law.

10. The City is an "employer" and a "public agency" within the meaning of the FMLA, 29 U.S.C. § 2611(4)(A)(iii). At all relevant times, Mr. Diorio was an "eligible employee" within the meaning of 29 U.S.C. § 2611(2): he had been employed by the City for far more than twelve months and had worked at least 1,250 hours in the preceding twelve months. The City itself determined in June 2025 that Mr. Diorio was eligible for FMLA leave.

11. Defendant Adam K. Thiel was at all relevant times the City's Managing Director. He signed and issued the letter terminating Mr. Diorio. He is sued in his individual capacity.

12. Defendant Nicole Morris was at all relevant times Deputy Chief for Planning & Strategy in the City's Office of Human Resources ("OHR"). She previously headed employment litigation in the City Solicitor's Office. She summoned Mr. Diorio to, and conducted, the June 18, 2026 termination meeting. She is sued in her individual capacity.

13. Defendant Kirk McClarren was at all relevant times Administrative Services Director of the City's Department of Licenses and Inspections ("L&I"). He attended the termination meeting and escorted Mr. Diorio from the building. He is sued in his individual capacity.

14. Defendant Candi Blossom Jones was at all relevant times the City's Chief Human Resources Officer and the Director of OHR. She approved the forfeiture of Mr. Diorio's civil-service restoration and appeal rights under Regulation 15.044.2. She is sued in her individual capacity.

15. At all relevant times, Thiel, Morris, McClarren, and Jones (the "Individual Defendants") acted under color of state law and within the scope of their City employment.

16. On information and belief, Thiel, as Managing Director, exercised final authority for the City over the decision to remove Mr. Diorio, and Jones, as Director of OHR, exercised final authority for the City over the decision to deny

him restoration to civil service under Regulation 15.044.2. Neither decision was subject to further review within the City.

**Mr. Diorio's employment and protected civil-service status**

17. Mr. Diorio worked for the City for more than 33 years.

18. Mr. Diorio holds permanent civil-service status in the City's classified service, in the title of L&I Code Administration Manager.

19. In or about February 2024, the City appointed Basil Merenda Commissioner of L&I's Inspections, Safety and Compliance division ("ISC"). Commissioner Merenda's first day in office was March 4, 2024. On that date, Mr. Diorio began serving as First Deputy Commissioner of L&I ISC in an acting capacity, pending approval of a Position Exemption Request ("PER").

20. On June 4, 2024, the Managing Director's Office ("MDO") advised L&I that, for retroactive appointments of civil-service employees to exempt positions, the employee should be granted a leave of absence from the civil-service position effective the Sunday before the retroactive effective date of the exempt appointment.

21. The MDO approved Mr. Diorio's PER on September 16, 2024, with an effective date retroactive to March 4, 2024. The City then imposed an additional vetting step by the Office of the Inspector General ("OIG"), which was not completed until December 12, 2024. In approving the vetting, OIG stated that such

positions did not need to be vetted because OIG focuses on Commissioners only.

22. The City formally appointed Mr. Diorio First Deputy Commissioner on February 3, 2025, with pay at the First Deputy level retroactive only to December 12, 2024.

23. Commissioner Merenda, as the head of L&I ISC, was Mr. Diorio's appointing authority and appointed him First Deputy Commissioner. Mr. Diorio reported directly to Merenda.

24. Mr. Diorio's exempt title was Assistant Managing Director 3, serving as First Deputy Commissioner of L&I ISC. He held that exempt position until the City terminated him on June 18, 2026.

25. Throughout his service as First Deputy Commissioner, Mr. Diorio remained on approved leave of absence from his permanent civil-service position. The City's process required that leave to be in place before his exempt appointment took effect. In November 2024, McClarren confirmed with the MDO's Human Resources office that the MDO would not process the appointment "until we place him on a Leave of Absence first." On January 24, 2025, McClarren submitted leave transactions for Mr. Diorio and two other L&I employees, Joseph Mehaffey and Kenisha Dockery, for review and approval. The City placed Mr. Diorio on leave from his civil-service title effective February 2, 2025,

recording the transaction as "LOA – On Leave to Serve in a Civil Service Exempt Position."

26. Under 53 P.S. § 12638 and Philadelphia Civil Service Regulation 17.01, no employee in the City's classified civil service may be removed, discharged, or reduced in pay or position except for just cause. Under Civil Service Regulation 22.04, an employee on approved leave has the right to be returned to the position he held when the leave was granted.

27. Mr. Diorio therefore had a legitimate claim of entitlement, and a property interest protected by the Fourteenth Amendment, in continued employment in his civil-service classification and in restoration to that classification upon the end of his exempt appointment.

28. Civil Service Regulation 15.044.2 provides:

> When an appointing authority determines that an employee in an exempt position who is on leave of absence from a permanent civil service position may no longer occupy that exempt position for any reason, the employee shall, upon request to the Director, be restored to the civil service position or equivalent position from which they originally requested the leave unless the removal is for disciplinary reasons. In that case, the appointing authority may take disciplinary action, in which case the employee shall forfeit restoration to their civil service position with the approval of the Director. The employee also shall forfeit any appeal rights to the Civil Service Commission.

29. Under Regulation 15.044.2, the appointing authority's own characterization of a removal as "disciplinary," with the Director's approval, simultaneously strips the employee of restoration to his civil-service position and of any appeal to the Civil Service Commission. The regulation provides for no notice of the charges, no statement of the evidence, and no opportunity to be heard, either before or after the forfeiture, on whether the disciplinary characterization is accurate.

30. Under Civil Service Regulation 2.03, the "appointing authority" is the officer or department head empowered to make appointments to the position. Under Civil Service Regulation 2.16, the "Director" whose approval Regulation 15.044.2 requires is the Director of the City's Office of Human Resources, not the Managing Director.

31. Regulation 15.044.2 is an official policy of the City.

**Prior lawsuits**

32. Mr. Diorio previously brought *Joseph Diorio, Jr. v. City of Philadelphia, et al.*, E.D. Pa. Civil Action No. 2:20-cv-06211, and *Joseph Diorio, Jr. v. Ann Pasquariello and Kirk McClarren*, Philadelphia Court of Common Pleas, June Term 2019, No. 190606346.

33. The federal action asserted that the City violated the FMLA. The state action asserted defamation claims against two City employees, including McClarren personally.

34. Throughout that litigation, Morris headed employment litigation in the City Solicitor's Office and oversaw the City's defense.

35. Mr. Diorio executed a settlement release on March 5, 2023. Among other terms, the settlement required the City to rescind records of specified January 2019 discipline and to undertake FMLA- and ADA-related training and a review of its intermittent FMLA letters.

36. The release expressly excludes claims arising after its execution. Mr. Diorio seeks relief only for the new conduct described in this Complaint, not renewed adjudication of the settled claims.

**Unpaid back pay**

37. Although the City approved Mr. Diorio's appointment as First Deputy Commissioner effective March 4, 2024, it paid him at the First Deputy level only from December 12, 2024. Of the back pay due for March 4, 2024 through December 11, 2024, the City has paid Mr. Diorio only $7,546.90; approximately $55,965 remains unpaid.

38. By contrast, the MDO approved the comparable senior positions in L&I's Quality of Life division, including its Deputy Commissioner of Operations and Deputy Chief of Staff, at a salary of $173,000, without comparable delay.

39. Mr. Diorio repeatedly asked City officials to resolve the back pay, including Merenda, McClarren, First Deputy Managing Director Tara Mohr, Dominick Mireles of the MDO, and Morris. Mireles told Mr. Diorio only that the matter was under review by Human Resources.

40. On May 7, 2026, Mr. Diorio's counsel wrote to the City Solicitor demanding payment of the back pay by May 18, 2026 and directing the City to implement a litigation hold covering documents concerning Mr. Diorio's back pay, employment, and job performance. Counsel followed up thereafter.

41. The City neither paid the back pay nor substantively responded before it terminated Mr. Diorio six weeks later.

**Safety complaints and workplace concerns**

42. Stephen Gallagher was L&I's Director of Emergency Services. Effective March 22, 2024, at McClarren's direction, Gallagher reported directly to Mr. Diorio, then Acting First Deputy Commissioner.

43. In or about April 2024, in Commissioner Merenda's office and in the presence of Merenda and Joseph Mehaffey, L&I's Deputy Commissioner of Field Operations, during a discussion of the City vehicles assigned to Gallagher's

staff, Gallagher told Mr. Diorio, "If I wasn't afraid of losing my job, I would put you in the hospital."

44. On May 17, 2024, Mr. Diorio wrote to Gallagher, copying Merenda and McClarren. He stated that Gallagher was reportedly telling staff that they need not follow Mr. Diorio's directions because he was "only acting" in his position; that Gallagher had not complied with Mr. Diorio's direct order to exchange certain City vehicles; and that rumors upsetting supervisors and staff appeared to originate with Gallagher. Mr. Diorio warned that continued conduct of that kind would be treated as insubordination.

45. On February 10, 2025, Mr. Diorio directed Gallagher in writing, copying Merenda and McClarren, to resolve a compliance problem raised by the City's Office of Labor Standards concerning the underpayment of prevailing wages to workers on L&I demolition contracts, and to provide a full written report. Mr. Diorio also noted that Gallagher had not responded to Mr. Diorio's inquiry about Gallagher's timecard.

46. Elizabeth ("Betsy") Baldwin, P.E., was L&I's Chief Code Official. In or about February 2026, Baldwin asked to move from her management position into a union-represented BPEE 1 position. Mireles asked Merenda and Mr. Diorio to wait before accepting her request.

47. On March 2, 2026, Mr. Diorio wrote to Mireles, copying Merenda, Chief of Staff Kenisha Dockery, and McClarren. He urged that Baldwin's request be granted and warned that the delay risked an unfair labor practice charge. He reported that rumors disrupting the department often started with Gallagher, whom he had warned in writing, and that "the environment is hostile." He wrote that the department needed "to ensure that we are following employment law and managing in accordance with the collective bargaining agreement," noting settled overtime grievances, a lost unfair labor practice complaint, and the settlement of Mr. Diorio's own FMLA interference lawsuit against the City.

48. That day, Mireles responded that "all next steps and related activity will be under the full advisement of the Office of Human Resources, Managing Director's Office, Department of Labor, and Law Department," and that Mr. Diorio should "continue to gather written documentation and witness statements." On March 4, 2026, Mr. Diorio asked Mireles to keep him informed of the progress of the investigation.

49. At 3:00 p.m. on March 4, 2026, Mr. Diorio met with Mireles and Morris, with no one else present, concerning his complaints about Gallagher and Baldwin. Mr. Diorio said he wanted counsel present unless he was assured that the discussion could not result in discipline.

50. Morris assured Mr. Diorio that nothing he said in the meeting would lead to discipline unless he threatened to kill someone. Mr. Diorio continued the meeting in reliance on that assurance.

51. On March 12, 2026, Mr. Diorio wrote to Commissioner Merenda, copying McClarren, requesting to work remotely until his safety could be guaranteed. Mr. Diorio cited Gallagher's threat "to put me in the hospital," Gallagher's open hostility, and the many locations without security or cameras where Gallagher could assault him without witnesses.

52. Mr. Diorio also made a hostile-work-environment complaint to L&I Human Resources, through Danielle Sullivan and McClarren, and asked the City either to relocate Gallagher or to permit Mr. Diorio to work from home.

53. That evening, McClarren responded that Mr. Diorio's concerns would be addressed through the City's Employee Relations Unit ("ERU") and that L&I would accommodate Mr. Diorio's request to work remotely "until this matter is resolved." The City did not relocate Gallagher.

54. On April 9, 2026, McClarren wrote that Mr. Diorio's safety concerns, and a hostile-work-environment complaint Mr. Diorio had previously made, had been forwarded to ERU, and asked Mr. Diorio for further details of Gallagher's threat.

55. On April 10, 2026, Donald L. Carmelite, Esq., of the law firm Marshall Dennehey, who had been retained by the City, contacted Mr. Diorio to schedule a meeting. On May 12, 2026, Mr. Diorio met with Carmelite. Mr. Diorio understood that the purpose of the meeting was to provide information about his complaint concerning Gallagher’s threat and conduct.

56. Mr. Diorio told Carmelite about Gallagher’s threat, the prevailing-wage underpayments, and Gallagher’s spreading of rumors and undermining of Merenda, Mr. Diorio, and the department’s objectives. Carmelite told Mr. Diorio that Baldwin had made a complaint against Merenda, and Carmelite repeatedly excused Baldwin’s unprofessional demeanor on the ground that “she’s an engineer.”

57. No one ever informed Mr. Diorio that the investigation of his complaint about Gallagher was complete or what its outcome was, and no one directed him to return to the office. Mr. Diorio continued to work remotely through June 18, 2026.

58. On information and belief, before June 18, 2026, Mireles emailed Merenda asserting that an investigation had been completed and that Mr. Diorio needed to return to the office. Merenda responded by asking for a copy of the investigation report and proposing that Merenda, McClarren, and Mireles meet with Mr. Diorio together to inform him. The City never provided the

report, never responded to Merenda, and never met with Mr. Diorio. Mr. Diorio did not learn of that exchange until after he and Merenda had been fired.

59. On information and belief, McClarren falsely told the MDO that Mr. Diorio had been informed that he could no longer work remotely.

60. On April 8, 2026, a parking garage at Children's Hospital of Philadelphia, at 30th Street and Grays Ferry Avenue, collapsed. The City's Law Department, together with outside counsel Scott A. Coffina, Esq., of Pietragallo Gordon Alfano Bosick & Raspanti, LLP, conducted an inquiry into the collapse, beginning with an in-person meeting attended by Merenda, Mehaffey, Mr. Diorio, Law Department attorneys, and MDO personnel, followed by weekly Microsoft Teams meetings. At the initial meeting, Mireles told the L&I participants: "Just stick to the facts and don't speculate."

61. After the initial meeting, Mr. Diorio told Merenda and Mehaffey that Baldwin's participation in the inquiry presented a conflict of interest because her team's processes were under review. On May 20, 2026, at a meeting with Coffina, Mr. Diorio repeated that concern.

62. At the same May 20, 2026 meeting, Mr. Diorio also told Coffina that Mohr and Mireles had prevented Mr. Diorio and Commissioner Merenda from implementing necessary changes to L&I's processes and procedures.

63. Mr. Diorio repeatedly raised concerns about the expense and performance of the Eclipse system with Merenda, Mireles, and staff of the City's Office of Innovation and Technology. Baldwin, who had participated in selecting and implementing Eclipse, reacted negatively to those concerns. Mr. Diorio told Mireles that Baldwin's resistance reflected confirmation bias, because she had chosen the system and did not want to hear criticism of it.

**FMLA leave and the renewal request**

64. By letter dated June 27, 2025, the MDO's Human Resources office approved Mr. Diorio to take intermittent FMLA leave for his own serious health condition(s) for the period June 6, 2025 through June 5, 2026, at a frequency of four to five times per month, lasting approximately one to five days per episode. The letter stated that leave beyond June 5, 2026 required a new certification, and that Mr. Diorio's supervisor would be informed of his FMLA eligibility by email.

65. Mr. Diorio's condition is chronic and ongoing. He used approximately eleven days of FMLA leave during the approval period.

66. On May 7, 2026, during a Microsoft Teams call lasting approximately 19 minutes, Mr. Diorio told Sharon Rainis, Senior Departmental HR Associate and Safety Officer in L&I Human Resources, that his FMLA authorization was expiring soon and requested renewal. Rainis said that she would have

Kathleen Purvis determine Mr. Diorio's eligibility and send him the paperwork to renew his FMLA leave. Rainis also told Mr. Diorio that the MDO had shifted responsibility for administering employees' FMLA leave to departmental human-resources staff.

67. The City did not send Mr. Diorio an eligibility notice, a rights-and-responsibilities notice, or a certification form.

68. Mr. Diorio's FMLA authorization expired on June 5, 2026 without the City having provided the renewal paperwork.

69. At 11:57 a.m. on June 18, 2026, Mr. Diorio emailed Rainis, copying Merenda, McClarren, and Danielle Sullivan, recounting the May 7 call and stating that his FMLA had expired and that he still had not received his eligibility statement or renewal paperwork.

70. At 12:09 p.m., Rainis replied that she "had thought [Mr. Diorio] had stated that it was expiring soon and would request it when it got closer," and that she would have the paperwork sent that day. At 12:14 p.m., she wrote that L&I Human Resources first had to request Mr. Diorio's time records from the MDO.

71. McClarren, who was copied on that exchange, conducted Mr. Diorio's termination meeting about an hour and fifteen minutes later. The City never sent Mr. Diorio the FMLA paperwork, before or after terminating him.

72. As First Deputy Commissioner, Mr. Diorio routinely advised employees who raised health-related scheduling concerns to contact Human Resources about applying for FMLA leave.

**The June 18, 2026 termination**

73. At 8:53 a.m. on June 18, 2026, Morris emailed Mr. Diorio, copying McClarren, directing him to meet with her and McClarren at 12:15 p.m. that day in the MDO's office on the 14th floor of the Municipal Services Building ("MSB"), and to bring all City property, including his City-issued laptop, City ID, L&I badge, building access cards, City-issued cell phone, and his City vehicle and its keys.

74. At 10:21 a.m., Mr. Diorio replied, copying his counsel, that he was represented and wanted counsel present, and that counsel was out of state that day but available the following week.

75. At 11:05 a.m., Morris responded: "Joe, you are not entitled to counsel at this meeting with HR so it will proceed today at 12:15."

76. At 11:43 a.m., Mr. Diorio asked whether he could bring a witness and asked to move the meeting to 2:00 p.m. so that he could arrange transportation home. At 11:46 a.m., Morris refused: "You are not permitted to have a witness," offering instead to arrange an Uber and insisting on 12:15 p.m.

77. At 11:50 a.m., Mr. Diorio wrote that he was still at home and could not arrive by 12:15 p.m., and that Gallagher might still be in the MSB or its parking garage, so he did not feel safe coming to the meeting alone.

78. At 11:55 a.m., Morris responded: "Moreover, an investigation has determined that Mr. Gallagher does not pose a threat to you and this has been communicated to you."

79. That statement was false. No one had communicated to Mr. Diorio that the investigation was complete or what it had determined.

80. At 12:01 p.m., Mr. Diorio asked whether he could have an observer and asked: "When was it communicated to me that an investigation determined Mr. Gallagher does not pose a threat to me?" At 12:25 p.m., Morris answered that "an observer is the same as a witness and neither are permitted." She never answered Mr. Diorio's question about the investigation.

81. At 12:34 p.m., Mr. Diorio wrote that he would bring his equipment and the car, and that "[i]f this is a termination meeting, I believe that I have the right to return to my former Civil Service position."

82. At 12:40 p.m., Morris rescheduled the meeting to 1:30 p.m., noting an early dismissal at 1:00 p.m. after which she expected most City employees to have left the building.

83. Mr. Diorio arrived at approximately 1:30 p.m. and met with Morris and McClarren in a 14th-floor conference room. As directed, he surrendered his equipment, his City vehicle keys, and his identification.

84. Morris handed Mr. Diorio a letter dated June 18, 2026, signed by Managing Director Thiel, stating that it "serves as the official notice of termination from your position as Assistant Managing Director 3 serving as the First Deputy Commissioner in the Department of Licenses & Inspections, ISC, effective Thursday, June 18, 2026."

85. Mr. Diorio had never met or interacted with Thiel.

86. The letter's only stated grounds were generalities: "Following a review of your conduct, including but not limited to, serious lapses in judgment, unprofessional behavior and practices that negatively impact the workplace culture at ISC and failure to follow directives, it has been determined that you failed to meet the standards required of your position. More specifically, you disregarded guidance and direct instruction, which irreparably damaged the trust and confidence necessary for continued service in your role."

87. The letter did not identify any incident, date, directive, person, document, or other evidence supporting those conclusions.

88. To the extent the City contends that Mr. Diorio failed to follow a directive to return to the office, no such directive was ever communicated to him.

89. The letter further stated: "Pursuant to Civil Service Regulation 15.044-2 [*sic*], you will not be granted restoration to your Civil Service title and forfeit the right to appeal to the Civil Service Commission."

90. On information and belief, Merenda, Mr. Diorio's appointing authority, did not determine that Mr. Diorio could no longer occupy his exempt position; the City terminated Merenda the same day. The termination letter was signed by the Managing Director, and it does not state that the Director of OHR approved the forfeiture of Mr. Diorio's restoration and appeal rights.

91. The first assertion that the Director of OHR had approved the forfeiture appeared in Jones's July 22, 2026 letter to the Philadelphia Civil Service Commission, five weeks after the termination.

92. Before the termination, the City gave Mr. Diorio no notice of any specific charge, no explanation of the evidence against him, and no opportunity to present his side.

93. The City had conducted no performance discussions, warnings, disciplinary hearings, or performance-improvement process with Mr. Diorio concerning any of the matters referred to in the letter.

94. No exigency prevented the City from giving Mr. Diorio notice and an opportunity to respond before terminating him. Mr. Diorio had been working remotely for more than three months.

95. After reading the letter, Mr. Diorio stated that he wanted to return to his civil-service position. Morris told him he could not do so because of Civil Service Regulation 15.044.2.

96. Morris then told Mr. Diorio that if "later today or sometime tomorrow you decide that you want to resign in lieu of termination you should reach out to me." Mr. Diorio declined and said he would appeal. Morris responded: "You can't appeal this to the civil service commission because of civil service regulation 15.044.2."

97. McClarren and another MDO employee escorted Mr. Diorio out of the building.

98. The City thus used its own unexplained, untested label of "disciplinary" removal both to strip Mr. Diorio of his civil-service position and to deny him any forum in which to contest that label.

**Differential treatment and departure from City practice**

99. Mr. Diorio is a white man who was 60 years old when the City terminated him.

100. The same day, the City also terminated Commissioner Merenda, a white man in his sixties, without prior discussions, discipline, or identified performance concerns.

101. On August 3, 2026, after Mr. Diorio and Merenda were removed, the City demoted Mehaffey, a white man in his fifties, to L&I Technical Code Specialist.

Neither Mr. Diorio nor Merenda, Mehaffey's superiors, had identified any concerns about Mehaffey's performance.

102. Unlike Mr. Diorio, Mehaffey was permitted to return to his prior civil-service position.

103. Dockery, Merenda's Chief of Staff, is a Black woman approximately 48 years old. She remained in her position without adverse consequences.

104. Like Mr. Diorio, both Mehaffey and Dockery had been placed on leave from civil-service positions effective February 2, 2025, to serve in exempt L&I positions.

105. In January and February 2025, Merenda sought to remove an exempt L&I employee, L&I's Director of Audits and Investigations, Jesus ("Joe") Serrano, a Hispanic man in his sixties, whose performance Merenda considered deficient. Among other things, Serrano never produced the construction-audit policies and procedures that Mehaffey had requested. On January 24, 2025, Merenda wrote to Mohr regarding the replacement of exempt employees he had inherited.

106. On February 26, 2025, Mohr, as First Deputy Managing Director, wrote to Merenda, copying Morris, to "reiterate [her] explicit directions" that L&I leadership (a) provide performance feedback to the employee; (b) provide performance expectations; (c) provide guidance on actionable improvements;

and (d) allow a reasonable period of time for the employee to meet those expectations. Mohr advised against a performance-improvement plan absent a documented discussion of expectations and examples of performance failures, and against "moving forward with discipline or separation until or unless there has been a PIP."

107. At a meeting attended by Merenda, Mehaffey, Dockery, and McClarren, when Mr. Diorio asked Mohr whether Serrano could be placed in a role in another department, Mohr yelled at him: "Why would I do that, Joe!"

108. Morris, who was copied on Mohr's directions, knew of that process.

109. The City followed none of those steps before terminating Mr. Diorio or Merenda.

**Administrative appeal and continuing deprivation**

110. On June 30, 2026, Mr. Diorio's counsel wrote to the City Solicitor objecting to the termination, demanding Mr. Diorio's restoration to his First Deputy Commissioner position or, alternatively, to his civil-service position, and reiterating the litigation hold. The City did not restore Mr. Diorio to either position.

111. On July 15, 2026, Mr. Diorio filed an appeal with the Philadelphia Civil Service Commission (Case No. 5789D) under Civil Service Regulation 17, challenging his dismissal from his civil-service position of L&I Code

Administration Manager as without just cause and challenging the constitutionality of applying Regulation 15.044.2 to deny him a hearing.

112. On or about July 21, 2026, the Commission issued a notice scheduling a hearing on Mr. Diorio's appeal for September 4, 2026.

113. On the morning of July 22, 2026, the City, through its Law Department, requested a continuance of the hearing, stating that "[a] continuance is necessary as we need time to gather information and interview witnesses," and that its assigned counsel would be on vacation in September.

114. The City's request confirms that, more than a month after it fired Mr. Diorio for purported misconduct, the City had not yet gathered the information or interviewed the witnesses on which any disciplinary charge would depend.

115. By letter dated July 22, 2026, the City, through Candi Blossom Jones, its Chief Human Resources Officer and Human Resources Director, objected to the Commission's jurisdiction, relying solely on Regulation 15.044.2. The City did not address Mr. Diorio's constitutional challenge.

116. In that letter, Jones stated that "at the time of his disciplinary removal from the exempt position, I reviewed the matter in my capacity as Human Resources Director and approved the determination that Mr. Diorio would not be restored to his former civil service position," and that her approval "resulted

in the forfeiture of both his restoration rights and his right to appeal to the Civil Service Commission."

117. Jones asserted that the City had not dismissed Mr. Diorio from his civil-service position but had merely declined to restore him to it, so that "there is no appealable civil service dismissal before the Commission." Whatever the label, the City's action permanently ended Mr. Diorio's civil-service employment and his right to return to it.

118. Jones did not identify any notice, hearing, or other opportunity to be heard afforded to Mr. Diorio before she approved the forfeiture, and none was afforded.

119. At 11:42 a.m. on July 22, 2026, Jones emailed her objection directly to the Commissioners, copying Commission staff, the Law Department, and Morris, but not Mr. Diorio's counsel. About forty minutes later, the City's counsel forwarded it to Mr. Diorio's counsel, stating that the HR Director had "inadvertently" left him off. Earlier that morning, the Law Department had requested the continuance described above.

120. On July 24, 2026, Mr. Diorio responded through counsel, explaining that applying Regulation 15.044.2 to extinguish his civil-service interest and appeal rights without any process would violate due process under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

121. The Commission subsequently stated that it would determine jurisdiction. The September 4, 2026 hearing did not occur.

122. In or about late September 2026, Mr. Diorio's counsel followed up with the Commission concerning the pending matter. The Commission has not responded.

123. As of the filing of this Complaint, the Commission has not determined whether it will hear Mr. Diorio's appeal and has held no hearing on the merits.

124. Mr. Diorio remains deprived of his City employment and its compensation while waiting not merely for a decision on his appeal, but for a decision whether he will receive a hearing at all.

125. The City's invocation of Regulation 15.044.2 and its request for postponement, together with the unresolved jurisdictional question, have left Mr. Diorio without any meaningful opportunity to contest the disciplinary characterization the City used to extinguish his civil-service status.

**Count I — Deprivation of pretermination due process**

Fourteenth Amendment; 42 U.S.C. § 1983

(Against Defendants City of Philadelphia, Thiel, Morris, and Jones)

126. Mr. Diorio incorporates the foregoing paragraphs as if fully set forth herein.

127. Mr. Diorio had a protected property interest in continued employment in his permanent civil-service classification and in restoration to that classification upon the end of his exempt appointment.

128. Before depriving a tenured public employee of such an interest, the government must give the employee notice of the charges, an explanation of its evidence, and an opportunity to present his side of the story. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985).

129. The City deprived Mr. Diorio of his property interest without notice of specific charges, an explanation of its evidence, or any opportunity to respond. The conclusory termination letter, handed to Mr. Diorio at the same meeting at which he was fired, did not satisfy those requirements.

130. Thiel, Morris, and Jones each personally participated in the deprivation. Thiel signed and issued the termination letter, which invoked Regulation 15.044.2 to deny restoration and appeal rights. Morris summoned Mr. Diorio, refused his requests for counsel and a witness, delivered the letter, refused his request for restoration, and told him he could not appeal.

131. Jones, the Director whose approval Regulation 15.044.2 requires, approved the forfeiture of Mr. Diorio's restoration and appeal rights without affording him any notice or opportunity to be heard.

132. A tenured public employee's right to notice of the charges, an explanation of the evidence, and an opportunity to respond before termination was clearly established long before June 18, 2026.

133. Thiel, Morris, and Jones acted intentionally and with reckless or callous indifference to Mr. Diorio's federally protected rights.

134. The deprivation was accomplished pursuant to Regulation 15.044.2, an official City policy, and by decisions of Thiel and Jones, who exercised final authority for the City over Mr. Diorio's removal and the forfeiture of his civil-service rights. The City relies on that regulation to forfeit Mr. Diorio's restoration and appeal rights based on its own disciplinary characterization, without first affording any process to test that characterization.

135. Regulation 15.044.2 is unconstitutional as applied to Mr. Diorio to the extent it permits this deprivation without constitutionally adequate safeguards.

136. The City's policy and the decisions of its final decision-makers were the moving force behind Mr. Diorio's loss of civil-service employment and resulting damages.

**Count II — Denial of meaningful and timely post-termination process**

**Fourteenth Amendment; 42 U.S.C. § 1983**

(Against Defendants City of Philadelphia, Thiel, and Jones)

137. Mr. Diorio incorporates the foregoing paragraphs as if fully set forth herein.

138. Mr. Diorio is entitled to a meaningful and timely opportunity to challenge the deprivation of his protected civil-service interest.

139. The City invoked Regulation 15.044.2 to deny any Commission appeal and sought postponement of the scheduled hearing. Mr. Diorio has received neither a merits hearing nor a jurisdictional decision establishing whether such a hearing will ever be available.

140. Thiel and Jones each personally participated in eliminating Mr. Diorio's post-termination process. Thiel signed and issued the termination letter declaring that Mr. Diorio would "forfeit the right to appeal to the Civil Service Commission." Jones, before any Commission proceeding began, approved the forfeiture of Mr. Diorio's appeal rights under Regulation 15.044.2, and then invoked that forfeiture to ask the Commission to dismiss his appeal.

141. A tenured public employee's right not to be deprived of a protected property interest without any meaningful opportunity to be heard, either before or after the deprivation, was clearly established long before June 18, 2026.

142. Thiel and Jones acted intentionally and with reckless or callous indifference to Mr. Diorio's federally protected rights.

143. The continuing absence of a hearing, or even a threshold jurisdictional determination, prolongs the deprivation without any review of the disciplinary basis the City relied on to deny restoration.

144. In the circumstances of this case, including the complete absence of pretermination safeguards and the continuing loss of compensation, the unresolved threshold question and the continued failure to afford a meaningful hearing deny Mr. Diorio due process.

145. The City's official policy, Regulation 15.044.2, by its terms forfeits all Commission appeal rights in cases the appointing authority labels disciplinary, and the City's use of that policy to exclude Mr. Diorio from administrative review caused and continues to cause that denial.

**Count III — FMLA interference**

29 U.S.C. § 2615(a)(1)

(Against Defendant City of Philadelphia)

146. Mr. Diorio incorporates the foregoing paragraphs as if fully set forth herein.

147. Mr. Diorio was an eligible employee with a serious health condition, previously certified by the City, that entitled him to intermittent FMLA leave.

148. Mr. Diorio gave the City notice of his need to renew his FMLA leave on May 7, 2026 and again in writing on June 18, 2026.

149. The City was required to notify Mr. Diorio of his eligibility and of his rights and responsibilities within five business days of his request and to give him the opportunity to provide a certification. 29 C.F.R. §§ 825.300(b)–(c), 825.305. The City did neither.

150. The City then terminated Mr. Diorio thirteen days after his authorization expired and less than two hours after he renewed his written request, ending his ability to obtain and use FMLA leave.

151. The City's conduct interfered with, restrained, and denied Mr. Diorio's exercise of, and attempt to exercise, his FMLA rights, and prejudiced him by causing the loss of his employment, compensation, and benefits.

152. The City's violation was willful.

**Count IV — FMLA retaliation**

29 U.S.C. § 2615(a), (b); 29 C.F.R. § 825.220(c)

(Against Defendants City of Philadelphia, Morris, and McClarren)

153. Mr. Diorio incorporates the foregoing paragraphs as if fully set forth herein.

154. Mr. Diorio engaged in protected activity by taking intermittent FMLA leave, by requesting renewal of his FMLA authorization on May 7 and June 18, 2026, and by previously filing and pursuing a lawsuit against the City alleging FMLA violations.

155. The City knew of that activity. City Human Resources personnel received Mr. Diorio's renewal requests; McClarren, who conducted the termination meeting, was copied on the June 18 request; McClarren was a defendant in Mr. Diorio's related state-court lawsuit; and Morris oversaw the City's defense of the prior FMLA action. In addition, on March 2, 2026, Mr. Diorio himself referred in writing to the settlement of his FMLA lawsuit, in an email to Mireles copying McClarren.

156. Morris and McClarren acted, directly or indirectly, in the interest of the City with respect to Mr. Diorio, and each is therefore an "employer" individually liable under 29 U.S.C. § 2611(4)(A)(ii)(I).

157. The City fired Mr. Diorio and denied him restoration to his civil-service position.

158. Mr. Diorio's protected activity was a motivating or determinative factor in those decisions, as shown by, among other things: the timing of the termination thirteen days after his authorization lapsed and six weeks after his May 7 renewal request; the City's failure to provide the requested paperwork; the involvement of McClarren and Morris; the absence of any specific reason for termination; the City's admission, more than a month after the firing, that it still needed "to gather information and interview witnesses"; the City's departure from its own stated process for removing exempt employees;

Morris's false statement about the Gallagher investigation; and the City's effort to obtain Mr. Diorio's resignation.

159. The City's stated reasons for the termination are a pretext.

160. The City's violation was willful, and it caused Mr. Diorio the loss of employment, compensation, and benefits.

**Count V — Whistleblower retaliation**

Pennsylvania Whistleblower Law, 43 P.S. § 1421 et seq.

(Against Defendants City of Philadelphia and Thiel)

161. Mr. Diorio incorporates the foregoing paragraphs as if fully set forth herein.

162. The City is an "employer," and Mr. Diorio was an "employee," within the meaning of 43 P.S. § 1422.

163. Thiel is also an "employer" within the meaning of 43 P.S. § 1422, as an agent of a public body and, on information and belief, as a superior of Mr. Diorio's supervisor, because L&I is a department under the Managing Director. He is individually liable for the reprisal.

164. Before his termination, Mr. Diorio made good-faith reports, verbally and in writing, to the City, including its managers, its Human Resources staff, and the attorneys and investigators acting on its behalf, of instances of "wrongdoing" within the meaning of 43 P.S. § 1422, including the following:

(a) On February 10, 2025, in writing to Gallagher, Commissioner Merenda, and McClarren, Mr. Diorio reported, and demanded correction and a written accounting of, the underpayment of prevailing wages to workers on City demolition contracts administered by L&I, in violation of the Pennsylvania Prevailing Wage Act, 43 P.S. § 165-1 et seq., and the City's prevailing-wage requirements for City contracts. On May 12, 2026, Mr. Diorio reported the prevailing-wage underpayments again, to Carmelite.

(b) On March 12, 2026, and thereafter, Mr. Diorio reported to Commissioner Merenda, McClarren, L&I Human Resources, the ERU, and Carmelite that Gallagher had threatened him with physical violence, in violation of City policies and codes of conduct prohibiting threats and violence in the workplace, which exist to protect the City and its employees.

(c) On March 2, 2026, in writing to Mireles, Mr. Diorio reported that the City's delay in acting on Baldwin's request to move into a union-represented position risked an unfair labor practice under the Pennsylvania Public Employe Relations Act, 43 P.S. § 1101.101 *et seq.*, and that the department needed to comply with employment law and its collective bargaining agreement.

(d) During the inquiry into the April 8, 2026 garage collapse, Mr. Diorio reported that Baldwin's participation presented a conflict of interest because her own team's processes were under review, and that Mohr and Mireles had prevented L&I leadership from implementing necessary changes to L&I's processes and procedures. He made both reports to Coffina on May 20, 2026.

165. The matters Mr. Diorio reported were not technical or minimal. They concerned the wages of workers on public contracts, the physical safety of a City employee, the integrity of an investigation into a structural collapse, and compliance with labor law.

166. Concrete facts and surrounding circumstances show that Mr. Diorio's reports led to his discharge, including the following: McClarren, who received the prevailing-wage and safety reports, carried out the termination. Morris attended the meeting concerning Mr. Diorio's complaints about Gallagher and Baldwin, promised that nothing he said would lead to discipline, then conducted the termination and falsely asserted that the Gallagher investigation had concluded and that its result had been communicated to him. The termination was issued by the Managing Director's Office, whose First Deputy Managing Director and staff Mr. Diorio had identified to investigators as obstructing necessary reforms. And the termination letter's only description of

his supposed misconduct, "unprofessional behavior and practices that negatively impact the workplace culture at ISC," tracks the very workplace conflicts he had reported.

167. Mr. Diorio's March 2026 reports, his May 12, 2026 statements to Carmelite, and his May 20, 2026 statements to Coffina all came within roughly three months of his discharge; the last came less than a month before it. Mireles, whom Mr. Diorio had criticized to investigators, had cautioned L&I leadership at the outset of the garage-collapse inquiry to "stick to the facts and don't speculate."

168. The City kept Gallagher in place, never told Mr. Diorio the outcome of the investigation of his complaint, and removed Mr. Diorio instead, without any specific stated reason, without following its own stated process for removing exempt employees, and before gathering information or interviewing witnesses.

169. By discharging Mr. Diorio and denying him restoration to his civil-service position because of his good-faith reports, the City and Thiel violated 43 P.S. § 1423(a).

170. Mr. Diorio brings this claim within 180 days after the June 18, 2026 discharge, as required by 43 P.S. § 1424(a).

171. Under 43 P.S. § 1425, Mr. Diorio is entitled to reinstatement, back wages, full fringe benefits and seniority rights, actual damages, and the costs of litigation, including reasonable attorney and witness fees.

**Damages**

172. As a result of Defendants' conduct, Mr. Diorio has lost and continues to lose earnings and employment benefits, and he continues to suffer harm from the deprivation of his civil-service employment.

173. At the time of his termination, Mr. Diorio's annual salary as First Deputy Commissioner was approximately $175,942. The City is now advertising his former position at a salary of $180,000.

174. The City's pension plan for Mr. Diorio is based on years of service and his three highest years of salary. The termination prevented Mr. Diorio from completing three years at his First Deputy Commissioner compensation level, reducing his pension, and prevented him from continuing toward eligibility for the City's Deferred Retirement Option Plan ("DROP"), for which he would have become eligible at age 62 in his exempt role. Had Mr. Diorio continued working to age 62, his annual pension would have been approximately $126,678; because of the termination, it will be approximately $84,773. He would have become eligible for DROP in February 2028, with an anticipated DROP payment of approximately $506,712.

175. Since his termination, Mr. Diorio has lost his City health coverage and has paid $1,691.39 per month for COBRA continuation coverage.

176. Mr. Diorio has also suffered emotional distress, including sleeplessness, anxiety, and humiliation, as well as damage to his professional reputation and uncertainty about his family's future.

**WHEREFORE,** Mr. Diorio respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally on the counts asserted against each, and award:

A. A declaration that the City's deprivation of Mr. Diorio's civil-service interest without adequate pretermination and post-termination process violated the Fourteenth Amendment;

B. A declaration that Regulation 15.044.2 cannot constitutionally be applied to Mr. Diorio to extinguish his protected civil-service interest while eliminating any meaningful opportunity to contest the basis for that deprivation;

C. Injunctive relief reinstating Mr. Diorio to his position as First Deputy Commissioner or, alternatively, restoring him to his civil-service position of L&I Code Administration Manager, or requiring the City to afford him a prompt, constitutionally adequate hearing on his loss of civil-service status;

D. An order requiring the City to remove from Mr. Diorio's personnel records the termination letter and any characterization of his removal as disciplinary;

E. Back pay, lost benefits including pension and DROP losses, front pay in lieu of reinstatement if appropriate, compensatory damages, nominal damages, and, on Count V, back wages, full fringe benefits and seniority rights, and actual damages under 43 P.S. § 1425;

F. Liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii);

G. Reasonable attorney's fees, expert fees, and costs under 42 U.S.C. § 1988 and 29 U.S.C. § 2617(a)(3), and 43 P.S. § 1425, together with pre- and post-judgment interest;

H. Punitive damages against Thiel, Morris, and Jones on Count I, and against Thiel and Jones on Count II; and

I. Such other relief as the Court deems just and proper.

**Jury demand**

Mr. Diorio demands a trial by jury on all issues so triable.

Date: November 2, 2026

Respectfully submitted,

***/s/Brian J. Foley***

**Brian J. Foley, Esq.** (PA ID No. 68806)
6701 Germantown Avenue, Suite 200
Philadelphia, PA 19119
(267) 930-4425
Brian@BrianJFoleyLaw.com
Attorney for Plaintiff